Thank you, Your Honors. May it please the Court, David Frederick for the patient plaintiffs, and I'd like to reserve six minutes of time for rebuttal, if I could, please. The District Court erred in finding preemption of all of plaintiff's claims. That error stemmed from three subsidiary mistakes. First, the Court misunderstood the basic test for preemption from Wyeth v. Levine. Second, the Court misread Buckman to preclude consideration of evidence that defendants knew of but failed to provide to FDA. And third, the Court improperly struck crucial expert evidence from Dr. Fleming, who opined about significant information known to defendants but not to the FDA. I'd like to start with the basic confusion over the test with Wyeth v. Levine. Wyeth, the Supreme Court confirmed that the label is the manufacturer's responsibility. And the Court went so far as to say it was hard to imagine the FDA rejecting a proposed label from the manufacturer proposing an additional warning. In this case, unusually, there was no proposed warning whatsoever. So what the District Court held was that preemption would occur, the impossibility prong of preemption would occur, notwithstanding the fact that none of the manufacturers had proposed any kind of warning concerning pancreatic cancer risk. And so to that extent, if you were to affirm, you would be the first court of appeals to find preemption in these unusual circumstances where there was no proposed warning whatsoever. But we're just in the soup. That's kind of spent. Because we have this clear evidence test, and we really, I think, the case law is a bookend case. There are cases where there was a request for an additional label and it was actually And then there are cases where it really looks like the FDA didn't even consider, have occasion to consider. So how does the existing case law really help us figure out what is or is not clear evidence? Well, I think COSAMAX is the closest case that addresses this point. It is the most recent, and it is one in which the evidence that had been concerning there was an absence of fresh evidence and what the Third Circuit held in reversing a district court order finding preemption was that these claims could go forward unless clear evidence could be shown to a jury's satisfaction, that this was a fact question. And the reason was there were ultimately credibility determinations between one of the scientists for the drug company who ostensibly took notes of a telephone conversation with an FDA official and the FDA's regulatorily required complete response letter. Can we really proceed in the absence of a definitive ruling in FOSAMAX? Sure. You absolutely can proceed because even if you were to say we need to wait and cert has been filed and we'll be filing our opposition brief this month, what you can hold here is that there was evidence that was not given to FDA that crucially would have supported a CBE amendment to the label. And keeping in mind the YF standard, that it is the manufacturer's responsibility to keep its label up to date, you have very crucial pieces of information that the district court didn't allow to be entered and preclude a discovery on because of misreading of Buckman, thinking that this was somehow a conversion from a failure to warn claim into a fraud on the FDA claim, which it absolutely wasn't. And that was clear error, so clear that the companies don't even really defend that part of the district court. But isn't that why this analysis, it seems to me like the decision tree is upside down. If there was a fundamental misunderstanding of Buckman then, discovery was improperly restricted. That's your argument. And evidence either wasn't available to you or it wasn't considered, and I do have a question about whether even your new safety data was considered at the summary judgment level. And that would be full stop, I think. I don't know where we would go any farther than that. Judge Christian, we would take that as remand, vacated remand, because you're absolutely right. That was clear, but I would urge you to couple that with a reversal of the preclusion of Dr. Fleming. He was improperly disqualified. If you look at his expert report, he lays out in great detail the evidence that was not known to FDA, and he knows that it wasn't known to FDA by comparing what the FDA wrote in the New England Journal of Medicine article versus what was in the drug company's files that was produced. So if we accept your proposed solution, you do not need to. But that wasn't my proposed solution. I'm just trying to make sure. Here's what I would like to do. I think for me it would be most helpful to set FOSAMAX aside because I think we have to wait. And it seems to me you have two arguments. One is that Buckman was fundamentally misunderstood and misapplied, and that hurts you two ways. One is in discovery and one is at the summary judgment and then Fleming. For my part, if you could take your best shot at explaining to me how you think the judge misapplied Buckman, that would be most helpful, and then your best shot at Fleming would be helpful. Sure. The district court made very clear in its order, and this is at ER 34, that it read Buckman as precluding evidence that could be adduced to show new evidence that the FDA hadn't considered. Buckman held nothing of the sort. Buckman was a very unique case in that it dealt with a claim against an intermediary, not the drug manufacturer, but an intermediary. The consultant. The consultant for ostensibly providing fraudulent information to the FDA. And it was a peculiar state law claim that allowed that to go forward because you couldn't assert failure to warn against the consultant. Right. So at the summary judgment, well, at the discovery level, the judge said that he thought Buckman was such a, he even used the word irrelevant. He wasn't going to allow discovery because he thought the evidence that really went to what he considered to be fraud on the FDA type claim was not going to be relevant. What I can't figure out is at the summary judgment level where he reiterated, I'm standing by this earlier read of Buckman, whether he really considered the new safety data that you were able to find in the discovery you did conduct. So he didn't. And let me make this point clear because at one point, and this is on page 31 of the excerpts of record. Right. The court says Buckman is implicated by plaintiff's defense to the clear evidence standard. This is about three-quarters of the way down the page. And what he's saying, in effect, is you can't produce new evidence that the FDA didn't consider. I'm constrained to consider only the evidence before the FDA as frozen in time by the New England Journal article. Right. Now, that has got to be error. And the reason we know that it has to be error is because the continuing, the changes being affected regulation allows for new information to justify an amendment to the label change. Counsel, I'm asking a more specific question. I'm not disagreeing with you, but I was looking at ER 32. Yes. Where he said that the court maintained its position as set forth in previous orders regarding the relevance of this data to the court's conflict preemption analysis. I'm trying to figure, but the same order, of course, analyzes, at least inventories, the new safety data that the plaintiffs were able to put on the board in opposition to summary judgment. So my question is pretty specific. Is it your view that he did or did not consider this information at summary judgment? I don't think he properly considered it because what he also had done was to strike Dr. Fleming. And he had not, he had disqualified Dr. Fleming, who had gone into great detail about the new evidence and why it was material and why it was important. That's point one. Point two, in the meantime, the district court had denied every single motion to compel, we believe, under a misguided view that Buckman precluded consideration of that evidence. So all of the efforts that we tried to make to get information that the defendants had in their files that would have been relevant to the determination, we were precluded from getting. Now, they're going to say we produced millions of pages of documents. But the truth is, the district court denied every single motion to compel that we brought and struck big swaths of Dr. Fleming's analysis going through the synthesis of why that new information was relevant. And all of those, I believe, were infected by an erroneous view of Buckman. Could you speak to Dr. Fleming, the disqualification of Dr. Fleming pursuant to the confidentiality agreement? Yes. The protective order requires there to be notice and that where there is a competitor is defined by a manufacturer. It is undisputed, because Dr. Fleming said so in his declaration, this is before you in the excerpts of record, that his company does not manufacture prescription drugs. It is true that it is in the middle of a clinical trial, but that is outside the definition of a manufacturer under the protective order. The drug companies, they draft these protective orders. They know how to write the words if they want to include people in the situation that Dr. Fleming was in. They didn't do that, and the district court overread the protective order to keep his testimony out. So we think there should be reversal on those grounds as well. Let me ask it a different way. I'm trying to figure out on this with respect to Buckman and what happened here. Was the potential discovery that the district court precluded under Buckman, and I think some examples are the HealthSigna assessment from Canada or the evidence of the precancerous lesions in primates, was that relevant to showing instances of fraud, or was it relevant to preemption or causation in some other way that would have been within the proper scope of the plaintiff's state law failure to warn claims? If you could just lay that out for me. The latter. It concerned whether or not there would be information to show causation for failing to warn, and it also was information that would have been important to the FDA to allow the hypothetical change to the label had the manufacturers done that. Remember, the inquiry, preemption inquiry is a hypothetical. So the reason it's important is because the health... Excuse me. So it's a hypothetical meaning had they generated a CBE, what would the FDA have done? Correct. Correct. And what happens when that overlaps? Excuse me. Well, what happens when it overlaps is the court should be allowing the discovery of this and the consideration of that evidence. Here, I don't think we could seriously argue that if a sister governmental agency concludes that there is a possible causal link between these drugs and pancreatic cancer, the FDA would want to know about that and would want to take that seriously. And yet, even though that had been produced to Merck by Canada in November of 2013, there was no indication in the New England Journal article in February 2014 that the FDA knew about it. And so the argument about preemption goes to had the FDA known about that, what weight would it have given that governmental report? Our submission is a rational finder. A fact would find that important information to decide that, in fact, the FDA would allow the manufacturers to add a warning concerning pancreatic cancer. So in your view, that would, though, be a question of fact and not one as to which you would be entitled to summary judgment from your end? Well, I think that we would be entitled to summary judgment to this extent. The fact that there was no evidence on the other side showing it was impossible to offer up a proposed amendment, this is evidence that shows that it would not have been impossible to do so because there was ‑‑ Well, I can imagine, though, that there might have been further investigation and perhaps disagreement with the government report and all kinds of possibilities, since we are looking at something that didn't happen. So that's why I'm trying to pin down whether you think that creates an issue of fact. Well, Your Honor, I would say under the Wyeth standard, the Supreme Court considered a situation where there was evolving evidence, there were revolving back and forth, and after a jury trial the Supreme Court concluded that trial does not need to be reopened. We find no clear evidence that the FDA would have rejected a better warning concerning the IV push method for Phenergan. But again, it's so different. I keep using the analogy to bookends, but it's just so different. The New England Journal of Medicine article in this case, your expert said, it's a very comprehensive study. It's the FDA's position statement. What we don't know is what they would have done. We don't know two things. We don't know what was still in the defendant's file cabinets, and we don't know what the FDA would have done had they had it or this new safety data, some of which, like the Health Canada study, we don't know if they had or not, although defendants say that was certainly publicly available. That's the rub, it seems to me. But the existing case law doesn't really help me very much at all. Well, I think that to a large extent you're right. Some of the district court opinions have not understood how to apply Wyeth, and I think clearly the district court here didn't. But the district court errors multiplied by its error because of misreading Buckman. And if you were to presume a situation which the Supreme Court held, the manufacturer has to keep its label up to date, this is all information that would be important to that inquiry. A sister agency from another government finds there to be a possible causal link. And these are all facts, including these reanalyses of animal studies, the biological mechanism, and importantly, what we know that Merck left out of information given to the FDA that would have doubled the potential risk because there were six pancreatic cancer situations as opposed to three in the placebo category. When you start multiplying all of this evidence, it becomes clear that had the manufacturers offered up a warning, the FDA would not have precluded it. And once you determine that, the preemption inquiry should end. If I could save the balance of my time, please. If I may do that. Thank you, Your Honors. Canon Chan-McGahm of Williams & Connolly for the Apples. May it please the courts, incretins are one of the most important tools in the fight against diabetes. And to this day, the Food and Drug Administration has not required incretins to carry a warning concerning the risk of pancreatic cancer. And during the time period relevant to this case, FDA comprehensively considered that precise risk, and it concluded, first, that the scientific evidence did not support a causal link between incretin use and pancreatic cancer. But if the FDA had imperfect information that was in the hands of your client, then how can you rely on that as sort of the king's ex, nothing else can happen here? Because that's a really perverse incentive. I mean, if you just look at the big picture, I'm not saying that there's anything nefarious that happened. But if the incentive is, if the rule is, you can ignore what the FDA didn't know that was relevant, that was in the hands of those who are being regulated, but that they did not give, then that creates a, potentially, a desire not to inform the FDA of things that are relevant to the analysis. So how is that right? I think that is an entirely valid point. And we are certainly not arguing, and we do not believe that Judge Battaglia, in fact, held that the FDA's assessment is the end of the analysis. And I do want to get to Buckman and the district court's order in a minute. But I do think that whereas here you have a comprehensive and repeated assessment of the precise risk about which plaintiffs complain. But that's a label. Comprehensive is a label based on what was actually in front of the FDA. It was comprehensive as to the 93 things they had, but not as to the 10 additional things that they didn't have. Understood. And so my point is not that that should be the end of the analysis, but my point is simply that if that were all that we had, in other words, if plaintiff's sole argument. I think you win that point. I think you win that point. If that was the universe of information, so how about the next point, which is the one we need to get to. Great. Well, let me move on directly to the primary focus of Mr. Frederick's argument, which was the Buckman issue. Great. I want to start by explaining why I think the district court started talking about Buckman in the first place, and then briefly walk through the discovery rulings, and then get to the summary judgment ruling, which is ultimately a first. You did the first part in your briefing, and we've read that. Okay. You think that the plaintiffs invited him. Yes, I think that's right. Okay, but didn't he fundamentally misunderstand Buckman? I don't think so. Could you get to that, please, because your time is ticking, and it's so important to the case. Sure. Absolutely. So first of all, let me start with the discovery rulings. And I think that what the district court did not do is that the district He said as much. He said as much. A couple times, it's frustrating, because a couple times he said, I know it's not a fraud on the FDA claim, but Buckman really counsels me. This is going to be irrelevant information. He uses the word irrelevant. How can you justify that? He does use that, but I think as you indicated in your colloquy with Mr. Frederick, he then backed away from a sort of dispositive view. In other words, I don't think you can fairly read, frankly, either the discovery rulings or the summary judgment ruling as suggesting that Judge Battaglia was just going to close his eyes. On the discovery rulings, I would just put a marker down. I think that the judge in this case was giving his very best shot, and he had some really talented lawyers doing their best, too, which is sometimes helpful and sometimes just muddies the water. So it was a really noble effort. But he didn't allow the discovery into the adverse consequences. Right? How is that consistent with Buckman? He cited Buckman as justification for not doing that. Critically, to the extent that his discovery rulings, and I will get to the summary judgment order, I promise, but with regard to the discovery rulings. Okay. He relied on Buckman really sort of clearly only with regard to adverse event reports. And I think if you take a look at both his. That's not a small thing. The adverse event reports is pretty significant. But take a look at both his order and his order on reconsideration. Okay. And both of those orders fundamentally, and really by the time of reconsideration, primarily rely on traditional discovery considerations. And in particular, the fact that the production of the underlying source files would be burdensome, given that the defendants had produced reports disclosing all of their adverse event reports worldwide. This was a dispute about the underlying. Okay. So I understand that. I understand that. But you've got half your time left. And it sounds to me, I'm not trying to give you a hard time, but it sounds to me like you're abandoning the Buckman defense. Are you going to defend? No, I am defending it to the hilt. Okay. As Judge Battaglia relied on it. Because I don't think that Judge Battaglia ultimately thought that Buckman was dispositive. And I think that that's true. Well, he does. He says multiple times the policy underlying the federal preemption of fraud on the FDA claims equally applies. I mean, he says that over and over. How can you say that he doesn't rely on Buckman? I'm curious. Well, I think he relies on. It was specifically for the fraud. Yes. Well, let's talk about the summary judgment rule. Because I think that the way he relies on Buckman is correct. He is relying on, as Judge Graber says, the policy underlying Buckman for the proposition that where FDA has conducted a comprehensive assessment of the very risk at issue, a court should not lightly second-guess that determination simply by virtue of the fact that the plaintiffs are coming in and asserting that there was some piece of evidence that may or may not have been considered by FDA. And I think that that's clearest in the summary judgment ruling on page 34 of the excerpts of record, where he says, and I'm quoting, under plaintiff's reasoning, a plaintiff could always cite to a particular piece of data, presumably unconsidered by the FDA, and overcome conflict preemption. And he goes on to cite Buckman in the very next sentence. I think that's right at some point. You could get down to a pretty granular level. But I've interrupted Judge Graber. No, go ahead. Yeah. But this isn't granular. This isn't granular. Well, no. I think this is very central. And I think it's very important to understand what Judge Battaglia proceeded to do. And as you alluded to in your colloquy with Mr. Frederick, Judge Battaglia then goes on from page 34 to page 36 to lay out the various categories of evidence. And I think that the fair reading of his opinion. The new safety information. Yes. That they were able to gin up. Correct. That's right. Right. Now, I do think on the discovery rulings, I think there are apples and oranges, and we're really talking about different categories of information. This is the part when you started a minute ago where I said, you know what? I think you've won this part, at least on my scorecard. If that were the universe of data and you had the New England Journal article, I think you'd be in really great shape. Well, if that's true, then the whole fight, Judge Kristen, I didn't mean to interrupt. I apologize. But the whole fight then is about whether the discovery rulings can be upheld. In other words, if you were to. . . That's almost true. You've still got a big problem of trying to understand what happened at summary judgment because I think it's quite conflicting about whether he did or did not. He certainly reaffirmed his earlier ruling of Buffman. But counsel, what about the discovery ruling? Well, this court does not sit to flyspeck every last word of a summary judgment ruling. It sits to review. . . Thank you. We got that part. Yes. I know you're aware of that. This court, with all due respect, sits to review the ultimate judgment. So we do have to fairly try to figure out on review what happened and was that information that was described as irrelevant, was it considered? I think this court can have confidence that it can uphold the judgment in this case, the summary judgment in our favor, based on the conclusion that to the extent plaintiffs point to new safety information, that that information was not material and that indeed the uncontroverted record indicates that that information would not have been material to FDA. What about the discovery? So on the discovery rulings, I think our argument would be that to the extent that the district court relied on Buffman, it plainly did so at most as an alternative rationale. And again, on the adverse event reports, which is where really the only one of these three categories of discovery rulings where the district court unambiguously relied on Buffman. The district court made clear, particularly by the time of its ruling on reconsideration, which I believe is pages 60 to 61 or thereabouts of the excerpts of records. Sixty to 61. That it was primarily relying on traditionally discovery considerations and the fact that the plaintiffs already had the defendant's reports disclosing all of their adverse event reports worldwide, the district court basically concluded that they did not need this underlying source data. They didn't need, you know, the zeros and ones in order to rely on the adverse event reports, because all of that information, including the entirety of the FDA and EMA regulatory files, had already been handed over. I'm sorry. I was just going to ask if you were going to speak to Fleming. Yeah, that's exactly where I wanted to go, was your view on the partial disqualification of Dr. Fleming. I saw nothing, and if I've missed it, I apologize, but I saw nothing demonstrating that he had access to confidential information regarding the specific items that he was excluded from testifying about and preparing his report about. He said he didn't, and I don't see the opposing evidence that he did. Sure. So the evidence on which we would rely is the evidence primarily in the supplemental excerpts of record from about page 241 to about page 521, and that's the evidence concerning Fleming's consultancy relationship with Novo Nordisk. A substantial percentage of that consulting relationship involved the very drug at issue, Victoza, and the development of that drug. And indeed, if you take a look at Fleming's report, he touted his work on Victoza as part of his relevant experience to establish his status as an expert in this case. That doesn't show that he had access to information that was covered by the confidentiality agreement, though. What did he see? What did he see? If you can point to the record right now, it would be your time. What did he see or have access to that was relevant to the current litigation? I will happily do that, but I just want to make clear. Then do it, please. Just do it right now. I want to write this instance. So in addition to touting his work on Victoza, pages 2576 to 2577 of the excerpts of record, Fleming was involved in discussions concerning the evaluation of the pancreatitis issue. And, of course, you have to keep in mind that this is a record. Point me to the record, please. Pages 357 and 364 to 410 of the supplemental record excerpts. And he also participated. Sorry, counsel, 357 to. . . I want to make sure I read it. 357 and 364 to 410. Thank you. And he also participated in observational studies concerning Victoza because, after all, this was at a time when the drug was being developed. And that's at pages 357, 372, and 398 to 399, again, of the supplemental excerpts of record. And while plaintiffs complain about our purported failure to produce an affidavit and that this was all counsel argument, this was all documentary evidence concerning meetings that Fleming attended and other discussions that took place that demonstrated that he was very much involved in the development of this drug. He signed numerous confidentiality. But as to the meeting minutes, for example, the judge said, well, it's not in the meeting minutes, but you can't, I think reasonably, can't expect everything to be in a meeting minute. Yes, but it's a very high standard to disqualify somebody's expert. Well, but I do think. And that's your burden. But, again, I think that that's reviewable for abuse of discretion. I think the critical fact is that you don't have to. Do you agree, counsel, before you go into that, do you agree that it was your burden to show that he should be disqualified in the circumstances? Yes. And our view is that that documentary evidence was sufficient and that what is not required, as plaintiffs suggest in their brief, is a showing that the confidential information to which he was privy was information about this precise issue, namely the risk of pancreatic cancer. I don't think that they, with all due respect, have any support for that proposition. Now, I wanted to clarify, in response to Judge Graber's question, that there are these two separate bases for the disqualification, the other being the fact that under the protective order, he was classed as a representative of a manufacturer. And to be precise, it's not just a manufacturer. It's a manufacturer or seller. Now, the argument that's being made on the other side is really a hyper-technical one. It's that notwithstanding the fact that he was the co-founder of a company that was producing what was effectively a competitor drug, a competitor diabetes treatment, he didn't fall within the letter of the protective order simply by virtue of the fact that his competitor company had not yet developed the drug to a point where it was manufactured. But you just said they're producing, and, in fact, they weren't producing. That's their whole point, right? No, if I said that, I misspoke. It's a competitor who's developing a competitor drug. And Judge Battaglia, I think quite appropriately, construing his own protective order, concluded that taking into account the goal of that provision of the protective order, it was fair to classify Excellen as a manufacturer or seller. Were the terms of the protective order stipulated, too, by the parties? Yes, that is correct. But even still, I think, again, Judge Battaglia was well within his discretion to conclude that it was essentially contrary to the spirit of that order. Now, I think that the critical point on the expert, and I think that the reason why one should not have too much sympathy for plaintiff's counsel here, is that contrary to their argument, they had every opportunity to come forward with an alternative expert as to the portion of testimony on which Dr. Fleming was excluded. And I would point this Court to page 51 of the record excerpts, which I think makes clear that, again, as to the excluded portion of his testimony, his testimony on this issue of materiality, the district court permitted plaintiffs to retain additional experts. The district court did go on to say, in the pages that plaintiffs cite, that to be sure, to the extent he was permitting Dr. Fleming to testify, there would be no need for plaintiffs to obtain an additional expert as to that testimony. But I really think that the fair reading of the district court's order is that plaintiffs had that opportunity, and certainly they did not object. And the reason why I think this is all so critical, and Judge Christin, this circles back to your question from about seven minutes ago, is that I think that this Court's task, and I think this gets us into the FOSTA-MAX issue and why I think FOSTA-MAX ultimately is not a basis for holding off on ruling here. I think, ultimately, this Court's task on summary judgment is the task that it has in any case on summary judgment. I respectfully submit it's to assess the record as it comes to this Court, and on this record, to be sure in part because of the exclusion of Dr. Fleming. The uncontroverted evidence indicates that these categories of purportedly new safety information would not have been material to FDA. I think this Court could have confidence in reaching that conclusion, even if there were no experts, or even if you had experts, because this Court's task under Wyeth v. Levine is to weigh that evidence against the evidence that FDA did consider. Mr. Frederick is correct at some level that Wyeth v. Well, FOSTA-MAX may change whose job it is to weigh the evidence, whether it's a jury's job or not. We seem to be talking a lot about the Third Circuit today. Well, it's closer to home for both Mr. Frederick and for me, but I don't think that FOSTA-MAX really alters the analysis here. And let me explain why that is true. I think that even the FOSTA-MAX Court, in concluding that the ultimate question under Wyeth v. Levine is a question for the jury, acknowledged that summary judgment could still be appropriate in some cases. This is a case where both plaintiffs and my clients, the defendants, in fact, moved for summary judgment, which I think reflected an acknowledgment that there are no disputed issues of historical fact here. Well, but we see, I mean, I don't mean to be cynical, but we see cases pretty regularly where both sides think they're entitled to summary judgment, and we conclude that neither of them is correct. And we don't. Because there are issues of fact. And if you had identified, if you could identify a disputed issue of material fact here, then I think this case would present one of the FOSTA-MAX questions, and one of the questions on which we disagree. One of the companies I represent, Merck, is the petitioner in the Supreme Court in the FOSTA-MAX case. And Merck's view, and the view of all of the defendants, is that this is ultimately a question for a judge to resolve, even if there might be some subsidiary questions of historical fact. My submission is simply that this court need not reach that issue here. And to the extent that there is also a dispute on the question of what the Supreme Court meant when it made its reference to clear evidence in the Wyeth v. Levine standard, we also don't think that that matters here. Because even if you think that that means clear and convincing evidence, notwithstanding the fact that the Supreme Court gave no other indication that it was disturbing the traditional preponderance standard, we believe that on this record we would still be entitled to summary judgment. And I think my friend, Mr. Frederick, acknowledges that in placing so much weight on Buckman. I think his fundamental submission this morning at oral argument is that he really needs that in order to get to a reversal because of the difficulty that he has in disputing the comprehensiveness of FDA's consideration, notwithstanding the fact that FDA did not have before it some proposed warning that was precisely the same warning that plaintiffs are seeking. In some ways what FDA did here was better because FDA conducted what even plaintiffs' expert acknowledged was an unprecedented analysis. It conducted this comprehensive assessment, looking at 250 studies, taking into account the results of 200 clinical trials, and it ultimately concluded, while it didn't have a proposed warning in front of it, that no changes to the current labeling were required. Counsel, that's the point I think you've already convinced us of. And it's really well covered in your briefing. But could you take, you have 1 minute and 30 seconds left, could you take your best shot at, or maybe you have, at the Levine issue? What aspect of the Levine issue? What's your best shot for us concluding? I think we've asked questions that indicate we are struggling to look in the record for where he was exposed to confidential data such that the stipulated protective order. I'm sorry, on the Fleming issue. Fleming. What did I say? Did I say Levine? Fleming. I think I've taken my best shot at the Levine issue. I'll give you 30 more seconds. Let me take one more shot at the Fleming issue. Well, where is it? The pages that you indicate, I've read all of them. I'm looking, looking. Where is it? Is there something else? Well, I just think that those are the pages that indicate that Fleming was a participant, he was involved in meetings, where the pancreatitis issue was being evaluated. Now, to be sure, I cannot point you to a smoking gun where the issue of pancreatic cancer was discussed. That is not surprising given that all of this took place at the time of the development of Victoza. But I don't think that that's required in order to satisfy the standard, and we cite the Hewlett-Packard case, but I think all the cases are consistent on this, for what the trigger is for confidential information. After all, this is an individual who was himself subject to seven confidentiality agreements with Novo, the manufacturer of Victoza, and our point is simply that having been involved in the development of this very drug and having touted his involvement with the development of this very drug as his expertise, that is more than sufficient under an abusive discretion standard to justify disqualification, what was ultimately a partial disqualification. Thank you. You would ask the judgment be affirmed. Thank you. Thank you. You have some rebuttal time remaining. Thank you, Your Honors. Let me start with Dr. Fleming. He testified, and this is Paragraph 7, Excerpts of Record 2794, that none of his work for Novo was about pancreatic cancer, and he further gave an uncontested declaration that his Novo consulting was actually irrelevant to the preemption and causation issues in the case. The district court said, credited that to some degree, but said he must have gotten some stuff and that was kind of in his head somehow that would have been important, but then didn't articulate on the record and, as your colloquy with my friend indicate, they can't point to anything specific. But they can point to the fact that it's an abusive discretion standard, right? Correct. And that's what they're arguing, and it is, and that's no small thing, so why should we – if the judge thought that this violates the spirit of the confidentiality agreement, and I think that's what the defendants are arguing, what's your response? We are talking – this is clearly an abusive discretion. We are talking about massive litigation involving hundreds of people whose claims are being thrown out of court in which the person who is the foremost person, because he headed the FDA office. This is the part I know. We know. And he's precluding him from offering up information that ties the new safety information that he will explain how the FDA did not consider it in connection with the New England Journal. So in terms of prejudice to us, it is massive. Okay, so is it your argument essentially that it's an abusive discretion standard, but in this particular case, given the importance of this expert and the fact that you didn't really have another one, I don't think, that filled this niche, did you? No. In fact, what the district judge – So does that change the standard? No. What the district judge said was, I'm going to do the preemption analysis myself. I'm going to strike the expert, and I'm going to try to figure this out myself. That's what the district judge did. And so by depriving us of the opportunity to have probably the world's foremost authority speaking to these very issues, there's no question that we were prejudiced. Now, on the other side of the balance, my friend, a very able advocate, can't give you one bit of any prejudice that the drug companies suffer here. And even if Novo somehow is prejudiced, that can't explain why Merck, which failed to give three additional tests of pancreatic cancer, or the health signal study from Canada, from Health Canada, would not have changed the way that the FDA would have drafted the New England Journal article and would have been relevant had Merck or one of these other companies come forward with a CBE label change. So to your hypothesized point, it is clear that the error that started this whole problem was with Buckman. And I would point you to page ER 68 where the court says, to allow discovery and by extension judicial consideration of compliance with federal reporting requirements would erode the FDA's role in the pharmaceutical regulation and neglect the policy underlying Buckman. Remember, in Buckman we're dealing with a cause of action that only concerns a very narrow noncompliance with FDCA. This Court en banc in the ‑‑ remembering the case at Stengel, Judge Watford has a very long explanation in concurrence for seven judges why that kind of analysis of Buckman does not foreclose a failure to warn claim. So when the judge got off track on that, it ended up infecting the discovery rulings and of course it affected the summary judgment standard. I would just point out that when you have a burden to show some prejudice and you can't demonstrate what that burden is, claiming a foot fault here, which is essentially what the district court did on the protective order where it's uncontested that Dr. Fleming's company is not a manufacturer within the meaning of the statute, that really is prejudicial. And once you reverse that and you allow this evidence in, what you end up finding is that the New England Journal, however comprehensive it was at the time, it excluded a number of incidences of pancreatic cancer that when you put them together showed a much greater increase in risk than it thought it was based on the initial reports that had been offered by the drug companies. Reversal absolutely is warranted here. The district court did abuse its discretion and committed errors concerning Buckman and Wyeth. Thank you.
judges: Graber, Murguia, Christen